Yes, I'm Stephanie Simpson representing Trotter. This is a Social Security case. I think the whole thing hinges on the ALJ minimizing the severe mental impairment that this claimant had. She was born in 1960 and she filed in 2000. She does have some physical impairments, but it's mostly the mental impairments. After the case had been remanded from the district court after the first administrative hearing, I requested the ALJ to send the claimant for an up-to-date mental examination. He refused to do it. The evidence does support that she had been treated since 1994 by a Dr. Lange for both physical and mental impairments. Then she saw a Dr. Karam, K-A-R-A-M, a psychiatrist, who gave her a GAF of 37, which means she was severely mentally impaired. Evidently from reading what the judge found, he did agree that she did meet the A criteria of the mental impairments, but not the B criteria. The B criteria calls for marked limitation or restriction of daily activities and marked inability to associate and marked concentration difficulties. The evidence does support that her daily activities are markedly restricted. In other words, she'd get up in the morning, probably do a few things around the house, and sit out in the backyard most of the time. Any bit of stress would produce anxiety attacks. She had two anxiety attacks a week. That has not been rebutted. The hypothetical to the vocational expert did not include really any of the mental impairments. Well, on cross-examination, when the vocational expert was asked to consider that she had two anxiety attacks a week where she had to go off by herself. What was the ALJ's ultimate ruling with regard to her mental health evidence? Pardon? What was the ALJ's ultimate ruling with regard to the mental health evidence overall? I don't understand. What was the ALJ's ultimate ruling with regard to the mental health evidence? That it was mild. And did he discredit Dr. Kareem? Did what? Did he discredit Dr. Kareem? Yes. He disregarded that. May I state this? She reapplied for benefits, and she has been found disabled. In August 2004, their consultant found that she did meet the both A and B requirements of 1204, listing 1204, which is the depression. Now, had the ALJ sent her for an up-to-date consultative exam at the time of the second hearing, there would have been no need, really, to appeal the case. But that wouldn't have established her condition in 2000, right? It would have established her condition in 2003. Well, 2004 was when their consultant also found her, met both the A and B criteria of 1204. In 2004. But she's trying to establish eligibility in 2000, right? Yes. And her, the psychiatrist, Dr. Kareem, did find a GAF of 37, which shows a very severe impairment. But the other doctor found a 61, which shows only a mild impairment. So the ALJ had to weigh those two different opinions. The what? There was another doctor who gave an opinion that the GAF was 61. Yes, that's it. But he examined her for one time. Whereas Dr. Kareem examined her from about 2001 to over 2002. But the ALJ was concerned because the treatment records underlying that were not supplied. Is that a correct understanding? Well, she had no money or anything for treatment. No, you said that Dr. Kareem had seen her more than once. Yes. But those records, according to the ALJ, the notes and the records from those visits were not given to the ALJ. They were. I think the records just show that Dr. Kareem saw her monthly from about 2001 to about August 2002. Maybe it was additional reports. There was something that the ALJ wanted from Dr. Kareem that was not supplied. What was that? Was not what? There was something that the ALJ wanted from Dr. Kareem that did not arrive. What was that? Was that a treatment plan or additional report? She wasn't treated with Dr. Kareem after August 2002. And the supplemental hearing was in February 2003. And as I stated, the consultative exam after that in August 2004 found her disabled, meeting both the A and B criteria. And she has been receiving benefits. The ALJ was required by law to include the mental limitations in his hypothetical to the VE. He did not because the VE testified if she has two anxiety attacks a week and must go off, there are no jobs she can do. And also if the medication affects her concentration, there are no jobs she can do. This case would appear to be one where the ALJ just minimized the mental impairments. And as I hate to repeat myself, but had he sent her for a mental examination when we had the remand hearing, then it would have been up to date as far as he was concerned and probably no further appeals would have been necessary. But I think if you want to read the medical again, you will see that it was the ALJ's minimizing the severe mental impairments here, which did meet the requirements of A and B in the four different mental impairments that she appears to have. Thank you, counsel. You have almost two minutes left for rebuttal. We'll hear from Mr. Kresger. Sir, this is how I understand the record with regard to the mental health issues, and I wanted to find out if I'm right. First of all, she was taking psychiatric medications during the relevant time period, including some that are prescribed for bipolar disorder and schizophrenia. Is that right? I note that she was taking psychotropic medications. Some of them were prescribed by the internist, Dr. Lang. I don't know if she was taking medications for schizophrenia. My understanding is she was taking surzones, Cyprexa, and Boost-Barnes, and they're antidepressants, anti-anxiety, and some are for more serious mental health issues as well. She was hospitalized at least once for mental health conditions. She was treated in a hospital emergency room for anxiety, following the death of her mother. The doctor, the consulting doctor who gave her the higher number has a very strange report, because he says at the beginning, he said, and he reports, that she said that she was hallucinating and she said that she had suicidal attempts and so on. And then at the end he says that he says pretty much the opposite, which is a little hard to understand, because his ultimate conclusion is that she denied suicidal and homicidal ideation, and that she was hallucinating. She denied that she was having hallucinations, delusions, et cetera, but earlier he had said that she said she did. So I don't understand that, and I don't understand how you can credit a report like that. I believe Dr. Bedrin mentions that he's both listening to whatever the claimant told him at the interview, and he's also reviewed extensive medical records, which would have included Dr. Kareem's records. But Dr. Kareem's records would have included the statements about hallucinations and suicidal attempts. No, he said, the patient stated, that sounds like to him, that she has been having auditory hallucinations where she hears voices. She said it sounds like people in general saying different things, like calling her names. She said she's had this since she was 40. She gets ideas where she thinks people are talking and laughing at her. She states that she's a prostitute at the time. She stated that she had several suicide attempts by taking pills. All of that is what she stated. That certainly sounds like what she stated. Then he comes to the end and he says she denied suicidal or homicidal ideation. She denied during the interview that she was having hallucinations. Maybe what he's saying is that she's denying that she was having it at that moment. Maybe that's what he means to be saying, but that doesn't seem terribly relevant. So he seems to just discount all the stuff she said without explaining at all why he's discounting it or if he's discounting it. Well, the Dr. Bedrin is basing his opinion on his mental status examination findings, so that if there were no findings on examination that the claimant was experiencing auditory hallucinations or seemed to be responding in any such way, then he would have said that. And that would be a finding supported by substantial evidence. I'm sorry, I'm not understanding that. At the examination, the doctor has the claimant's statements both in writing and whatever oral interview might have taken place. He would have had, in this case, the medical records. So when Dr. Bedrin says the claimant states, that might have been something that was set forth in a written statement that's part of the Social Security claim. There's absolutely no indication of that. Information in this evaluation was obtained from her, the patient was an adequate historian. That sounds to me like she's talking to him. There's no indication that he's looking at any records and that this isn't just a conversation he's having with her. But I'm merely trying to explain that's generally what happens in the course of these examinations. The mental status examination, which is set forth in a separate section of Dr. Bedrin's report, indicates that the claimant is not experiencing psychotic symptoms. It may be that she alleges them, but they're not there. Did anybody ask him at the hearing why these two things seem to be contradictory? I'm sorry, did anybody? He testified at the hearing, didn't he? No, Dr. Bedrin did not testify at the hearing. There was no medical advisory here. So we have, it seems to me at least, and then we have Dr. Karim's report itself. So we have a fair amount of substantial evidence that this woman had serious problems, including medication for psychosis and hospitalization, at least briefly, for a mental health problem. So from whence is there substantial evidence that this is not sufficiently severe to impair her function? Well, the ALJ found that she's had a severe mental impairment. The ALJ did not find that that impairment met or equaled the criteria for presumptive disability at Step 3. And the appellant had the burden of proving that she was disabled at Step 3 and didn't meet that burden. The ALJ's decision was supported by Dr. Bedrin's report, which was substantial evidence. It was the ALJ's job to weigh the evidence, and he found Dr. Karim's report lacking. Dr. Karim only treated the claimant on a very few occasions and hadn't seen the claimant for something like since August 2002. Which was a considerable period of time prior to the ALJ hearing. Well, a second ALJ hearing, because the first one went ahead without the claimant. That's correct. The second ALJ hearing, the one that's issued. Which puts her at some disadvantage to begin with, because she was trying to prove a disability going back to 2000, and really was already by August 2002 something of a disadvantage as a result. But at that point could have produced contemporary evidence of treatment, and there was no evidence of treatment. Is that true? I thought that she also submitted to the appeals board some evidence of treatment, which corroborated this. One month after the ALJ hearing in February 2003, she went to the county health department and presented with a host of symptoms, and a letter was submitted to the appeals council, which found that those, that letter did not warrant a remand. And one point I'd like to make with regard to repellent's contention that the subsequent award of benefits would warrant a remand. In the Bruton case this court Did doctors usually give antipsychotic medication to people who aren't psychotic? I can't say what doctors usually do, but I've seen antipsychotics in our cases prescribed in some unusual cases. Just to conclude about the court's finding in Bruton was that a subsequent award of benefits was not material to, and was not a basis for remanding a current court claim. Our position is that the ALJ articulated legally sufficient reasons supported by substantial evidence for rejecting Dr. Kareem's opinion. Those reasons are set forth in the ALJ's decision and in the brief that we submitted to the court. Certainly there were reasons for the ALJ to reject the contentions. The ALJ found that the claimant herself was lacking in credibility, particularly with regard to some of her psychiatric symptoms. But what about the statement that she, that her, it must be true that she can read because she had stopped driving, so she was driving before? Well, this seems to have been critical to Dr. Kareem, that the claimant said she couldn't read. But the ALJ found that the claimant had once had a driver's license. Well, first of all, nobody ever said she had a driver's license. All she said was that she drove. You know, people drive without driver's licenses. That's number one.  Number two, I don't happen to know whether you can get a driver's license without being literate, and I assume that, but I don't know, but it's not in the record either, whether you can have someone else read to you to take a driver's license written test. I don't know the answer. But the ALJ didn't seem to know it either. He was just making assumptions. Well, there were other reasons for the ALJ to conclude that the claimant actually had more capacity for reading than just that she had a driver's license. In addition to the 10th grade education, special education or not, she had had a written psychological examination in 1997 that Dr. Izzy administered. Dr. Kareem didn't actually say that she couldn't read. I think what she said was that she gave her an examination and she couldn't read the questions, which is ambiguous. It may mean that she was too upset to read them or that she could read some but not that complicated. At least I didn't see that it said she couldn't read at all. Is there something I'm missing in that report? No, Dr. Kareem says that she couldn't read more than three or four-letter words and that he had to orally administer one of the examinations he gave her. But it wasn't clear whether that was because of anxiety at the moment or whether it was illiteracy. I'm not sure I'm making myself clear. And I'm not sure what his conclusion was either. Regardless, the ALJ posed a question to the vocational expert that suggested that all the jobs the vocational expert identified could have been performed by someone who was illiterate. So the claimant's capacity for reading really is not a relevant issue at the moment. And I'm not sure that the ALJ's final decision, did I express that clearly? I think I understand the answer. Any other questions since counsel's time has expired? Thank you. You have some rebuttal time remaining. I would like to state that regarding her not telling the doctor about the hallucinations and so forth, she did state that she was afraid they'd take away her children from her if they found out that she had hallucinations and so forth. So that would appear to be a logical answer to why she didn't tell a certain doctor. But she did tell Dr. Karim. And also, she did see a Dr. Sigmund right after the remand hearing. And she was treated by him. He was an L.A. mental health doctor, psychiatrist. And I did send for the medical report where she was found disabled. After she reapplied, I do have it. And when I asked to supplement the record, I was told to let the panel decide whether or not to have that go. And as I stated before, I think that if the ALJ had brought out the seriousness of the mental impairment right through the hearing, then, and also included, that in his hypothetical to the vocational expert, then this case would have ended the way it should have. A woman here, a claimant here, who has been mentally disabled for many, many years. And can only read three or four letters and words and so forth and so on. So thank you very much. Thank you, counsel, we appreciate the arguments of the parties. And the case just argued is submitted. We'll hear one more case before our break. And that is, I'm not sure I'm pronouncing it correctly, but Wang v. Astrid.
judges: Hall, Graber, Berzon